**Mary HUBBARD, Plaintiff,**

v.

**BLUE CROSS BLUE SHIELD ASSOCIATION,
Defendant.**

**No. 96 C 7121.**

United States District Court,
N.D. Illinois,
Eastern Division.

April 9, 1998.

---

Gail K. Rabinowitz, Chicago, IL, Elizabeth Hubbard, Hubbard & O'Connor, Ltd., chicago, IL, Kwame Yves Raoul, Jean–Baptiste & Raoul, Chicago, IL, for Plaintiff.

Marry Hubbard, Calumet Park, IL, pro se.

Paul Jordan Cherner, Kerryann Marie Haase, Steven Jay Teplinsky, Michael, Best & Friedrich, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This dispute centers on allegations that defendant Blue Cross Blue Shield subjected plaintiff Mary Hubbard to various forms of employment discrimination during her tenure, ultimately terminating her while she was on medical leave. Specifically, Hubbard claims in her amended complaint that Blue Cross violated the Family Medical Leave Act ("FMLA")29 U.S.C.A. 2601 *et seq.*, 28 U.S.C. § 2617 and 28 U.S.C. § 1331, by firing her while she was on leave (Count I); and violat-

ed Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by failing to promote her because she is female (Count III) and by retaliating against her for complaining that sex played a role in her non-promotion (Count IV).[1] Before this Court is Blue Cross' Motion for Summary Judgment on all counts.

## RELEVANT FACTS

The following facts are drawn from the parties' Local General Rule 12 statements of fact.[2] In March 1987, Hubbard began working for Blue Cross as a secretary. She advanced through a series of promotions to the level of Billing Manager in Blue Cross' Operations Service Center ("OSC"). Def.'s Facts ¶¶ 5–6. She worked in this position, apparently without incident, from November 1994 until early June 1995, when OSC was reorganized by the department manager, Michael Lacivita. Def.'s Facts ¶ 9. Lacivita rewrote the job descriptions for two of the four Billing Manager employees, promoting them to Billing Manager II—a supervisory position.[3] *Id.* ¶ 11; Def.'s Resp. Add'l Facts ¶ 8. Those promoted, Anthony Fortier and Kenneth

Thompson, were male. Def.'s Facts ¶ 11. Two females, Hubbard and Ju–Ton Loving, remained in Billing Manager positions and subsequently lost their offices. Pl.'s Facts ¶ 9; Hubbard Aff. ¶¶ 2, 5. Under the OSC reorganization, Hubbard reported to her former peer, Fortier, an employee with whom she had been having some personal differences. Def.'s Facts ¶ 18; Pl.'s Add'l Facts ¶ 20.

Shortly after the reorganization, Lacivita gave Hubbard a positive one-year performance review. Pl.'s Add'l Facts ¶ 21. Signed on June 21, 1995,[4] the review awarded Hubbard a "CME" rating—meaning that she "consistently meets and at times exceeds expectations."[5] Pl.'s Facts Ex. 6, at 6. A generally glowing review, it marked only two areas for Hubbard's improvement: the need to "be even more aggressive in getting her ideas expressed" and to follow up "with the many open items a billing manager has to deal with"—although Lacivita admitted that the main reason for the open items was "Mary's own initiatives in resolving billing issues that she has surfaced," and later conceded that Hubbard "in fact closes out most

---

1. We need not consider Count II, which alleges disability discrimination under the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, because Hubbard explicitly abandoned this claim in her response to Blue Cross' summary judgment motion.

2. Local General Rule 12(M)3 requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS LOCAL GENERAL RULE (hereinafter "Local Rule") 12(M)(3). The *movant's statement must contain* "specific references to affidavits, parts of the record, and other supporting materials upon to support the facts set forth." *Id.* Blue Cross' statement shall be cited as "Def.'s Facts ¶ __." Similarly, Local Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Hubbard's response shall be cited as "Pl.'s Facts ¶ __." Local Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that require the denial of summary judgment"; pursuant to Local Rule 12(M), the moving party may then submit a reply to the non-moving party's additional facts. Hubbard's statement of additional facts shall be cited as "Pl.'s Add'l Facts ¶ __," and Blue Cross' reply shall be cited as "Def.'s Resp. Add'l Facts

¶ __." All properly supported material facts set forth in either party's statement (i.e., Def.'s Facts or Pl.'s Add'l Facts) are deemed admitted unless properly controverted. *See* Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Institute*, 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–922 (7th Cir.1994); *Stewart v. McGinnis*, 5 F.3d 1031 (7th Cir.1993). Moreover, the mere denial of a particular fact without "specific references to the affidavits, parts of the record, and other supporting materials" is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Flaherty*, 31 F.3d at 453.

3. These positions were not required to be posted; Blue Cross policy affords department heads the discretion to rewrite subordinate positions and promote from within the department. Def.'s Facts Ex. 1 ¶ 4.

4. Hubbard's review was dated June 7, 1995, but Lacivita and Hubbard did not sign it until two weeks later.

5. This was consistent with all of Hubbard's previous reviews from other supervisors. Pl.'s Add'l Facts ¶ 1.

items very quickly." *Id.* at 2, 5. Otherwise, Hubbard was "masterful at handling our customers ... in difficult situations," possessed "top-notch" customer service skills, and was "driven to provide client satisfaction. She represents HMO–USA in a positive, professional manner." *Id.* at 2–3. Although the evaluation did not specifically address Hubbard's attitude toward or relationships with superiors, Lacivita did note as "particular strengths" that Hubbard "[i]nteracts courteously and professionally with peers, subordinates, and other employees" and that she "[c]reates a positive corporate image in dealing with co-workers ...." *Id.* at 3–4.

Notwithstanding her positive review, Hubbard was dissatisfied with her working conditions after the reorganization. She lodged two complaints—one to Beth Williams in the Human Resources Department and one to Lacivita. Pl.'s Add'l Facts ¶¶ 9–10. Hubbard complained to Williams about the fact that two males had been promoted to Billing Manager II. Pl.'s Add'l Facts ¶ 10. To Lacivita, Hubbard indicated that "sex played a role" in her non-promotion; she testified that she indicated this by asking him "why the women los[t] their office[s] and the men didn't." Hubbard Dep. at 578. Hubbard did not, however, specifically tell Lacivita that she believed she did not get the promotion to Billing Manager II because she is female. *Id.*

On July 12, 1995, approximately one week after Hubbard complained to Williams and Lacivita,[6] Hubbard received a Documented Verbal Warning ("DVW"), which is a step toward termination. Def.'s Facts ¶ 20; Pl.'s Add'l Facts ¶ 12. Fortier issued the DVW at Lacivita's direction. Fortier Dep. at 116; Lacivita Dep. at 25, 42. In the month since Fortier had begun supervising Hubbard, he noticed certain behaviors on her part that he felt justified the DVW. First, he testified that Hubbard did not pay attention to detail. Fortier Dep. at 105. Second, he testified that Hubbard "had a history of arriving late and leaving early," although he could neither point to a specific occasion nor estimate how often she trimmed work hours. *Id.* at 106–08. Fortier's final justification for the DVW was

Hubbard's insubordination. He testified that Hubbard refused to provide him on one occasion with information about her accounts, remarking to Fortier that it was "not a good day," and she was "not in the mood" to discuss them. *Id.* at 109–10. Fortier conveyed Hubbard's performance expectations following the DVW in a memo dated July 12. *See* Def.'s Facts Ex. 7. Before Fortier issued the DVW, he learned from Lacivita that Hubbard had complained about her non-promotion to both Lacivita and Williams—although it is unclear from the record whether he knew the basis for Hubbard's objection to her non-promotion. *Id.* at 115–16; Pl.'s Add'l Facts ¶ 12.

Lacivita testified that he and Fortier had met with Beth Williams in early July to "explore our options" in disciplining Hubbard. Lacivita Dep. at 25. Personally, Lacivita wanted Hubbard fired. Lacivita Dep. at 25–26. He testified that a single incident of insubordination—an incident he never witnessed, but only heard about from Fortier—prompted the DVW and, he felt, justified her termination. *Id.* at 26; Pl.'s Add'l Facts ¶ 18. According to Lacivita, Hubbard "created a scene at her cubical when given an assignment"; he explained that "[s]he refused to accept the assignment and she spoke in tones that were clearly disrespectful to her supervisor." Lacivita Dep. at 26–27. Lacivita instructed Fortier to issue the DVW without any further investigation.

Lacivita admitted that Fortier's report was inconsistent with his four-month experience supervising Hubbard and with her entire personnel history. Lacivita Dep. at 40. Hubbard's personnel file revealed no previous incidents of insubordination. *Id.* at 28. Lacivita acknowledged that Hubbard had never been insubordinate toward him either, and was cordial when he approached her with suggestions for improvement. Pl.'s Add'l Facts ¶ 15.

What followed was a deterioration in Hubbard's employment situation. Between July and September, Hubbard admits that she filled out time sheets indicating her attendance on four days that she was actually ab-

---

6. Hubbard complained to Lacivita on July 4, 1995.

sent, and that she frequently turned in her time sheets late. Def.'s Facts ¶¶ 24–26. Lacivita received reports from several sources that Hubbard was missing deadlines and refusing assignments. Lacivita Dep. at 48. She often arrived at work late and left early. Prior to the OSC reorganization, however, Hubbard was given informal permission to keep flexible hours because she was taking classes outside of work. Blue Cross admits that Lacivita instructed Fortier to monitor and log Hubbard's arrival, and that no such log was kept on any other employee, even though several were regularly late for work. Pl.'s Add'l Facts ¶¶ 26–33.

On September 25, 1995, Hubbard was placed on a Corrective Action Program ("CAP"). Def.'s Facts ¶ 27. The CAP was a probationary program that was to last 90 days. It required Hubbard to meet several performance goals, including arriving at work on time, reducing unreported absenteeism, completing time sheets correctly, ceasing insubordinate and hostile responses to work assignments, and providing Fortier with face-to-face bi-weekly status reports. The CAP stated that Hubbard's failure to meet any one of these performance objectives would result in her termination. Def.'s Facts Ex. 9. Hubbard denies that she ever responded in a hostile or insubordinate manner to receiving work assignments. Pl.'s Resp. ¶ 28.

While on the CAP, Hubbard continued to make errors on her time sheets and to turn them in late. Def.'s Facts ¶ 32. Fortier reported these incidents on Hubbard's first bi-weekly review, dated October 6, 1997. In addition, on both this and a subsequent review dated October 20th, Fortier reported that Hubbard continued to exhibit hostility and to resist work assignments. Id. ¶ 33. The October 20th review also faulted Hubbard for tardiness on one occasion. Id. ¶ 34. Hubbard refused to sign these reviews; however, she did not specifically contest them in writing or contact anyone to register her disagreement. Def.'s Facts ¶ 36.

Lacivita testified that on Friday, October 20, 1995, he met with Fortier and two Human Resources employees, Kari Kronborg and Tenia Glass, to discuss Hubbard's employment situation. Lacivita Dep. at 70. At that time, he claims, the four of them decided to terminate Hubbard effective Monday, October 23, 1995. Id. at 70–71. But Hubbard did not return to work on or after October 23. Def.'s Facts ¶ 41. She filed for short-term disability for depression, and began leave under the Family and Medical Leave Act ("FMLA") on November 11, 1995. Id. ¶ 42.

According to Hubbard, the decision to terminate her was made not on October 20, but rather while she was on medical leave. Pl.'s Resp. ¶¶ 39–40. She draws this conclusion from various pieces of evidence. First, Hubbard points out that Fortier sent her an e-mail message on October 23 requesting her time sheet. Pl.'s Add'l Facts ¶ 45. Second, Hubbard cites Fortier's testimony that he, Lacivita and human resources personnel discussed among themselves whether Hubbard would be returning and whether they could take disciplinary action against her while she was on medical leave. Fortier Dep. at 182. Third, Hubbard attaches to her summary judgment materials a letter that Tenia Glass wrote, but never signed, directing Hubbard to return to work on January 2, 1996.[7] Pl.'s Add'l Facts ¶ 48. Lacivita testified, however, that Hubbard would have been terminated if she had come back to work on October 23. Lacivita Dep. at 71–72.

Nevertheless, Hubbard states that she had no idea that her termination was contemplated until December 29, 1995, when she received a letter from Beth Williams informing her that failing the CAP goals prevented Hubbard from returning to her previous position and department. Pl.'s Add'l Facts ¶ 47. Williams' letter presented two options: a 30–day job transition program, without pay, after which Hubbard could interview for other positions at Blue Cross, or immediate termination. Def.'s Facts Ex. 11. The cho-

7. Hubbard claims that this letter followed a telephone conversation between her and Glass, during which Glass requested Hubbard to return to work on January 2. However, Hubbard has not come close to establishing the foundation required for us to consider the alleged telephone conversation as evidence. See Fed.R.Evid. 901(b)(6).

sen option was to take effect on January 2, 1996, upon Hubbard's return from leave. Pl.'s Ex. 11. Hubbard entered the transition program on that date, but did not seek another position within the company. She was ultimately terminated on February 16, 1996. Def.'s Facts ¶ 46.

On January 4, 1996, Hubbard filed charges with the Equal Employment Opportunity Commission and the Illinois Department of Human Rights. After receiving a notice of right to sue, she filed this action on February 6, 1997.

Hubbard alleges that (1) her termination while on medical leave violated the FMLA; (2) her non-promotion and loss of office were the result of sex discrimination; and (3) the DVW, the CAP, and her termination were retaliation for complaining that sex played a role in how Lacivita implemented the OSC reorganization. Blue Cross moves for summary judgment on all these claims, contending that (1) Hubbard cannot establish a FMLA violation because poor performance prevented her from returning to the Billing Manager position after her medical leave; and (2) Hubbard fails the prima facie case for both sex discrimination and retaliation under Title VII, and has no evidence impugning Blue Cross' nondiscriminatory reasons for issuing the DVW, placing Hubbard on the CAP, or terminating her.

Evaluating these arguments under the standards for summary judgment, we conclude that Hubbard cannot prevail on her FMLA claim as a matter of law; however, she has raised genuine issues of material fact that require trial on her sex discrimination and retaliation claims. Blue Cross' motion for summary judgment is therefore granted in part and denied in part.

## LEGAL STANDARDS

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court must view all evidence in a light most favorable to the non-moving party, and draw all inferences in the non-movant's favor. *See Wolf v. Buss America, Inc.*, 77 F.3d 914, 918 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). But if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50; *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1212 (7th Cir.1993).

In ascertaining whether a genuine issue of material fact exists, the court must "view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254. If the "record taken as a whole could not lead the trier of fact to find for the non-moving party, there is no genuine issue of material fact for trial." *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, this Court's sole duty is to determine whether sufficient evidence exists to support a verdict in the non-movant's favor; credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of the judge deciding a motion for summary judgment. *See Liberty Lobby,* 477 U.S. at 255. These pronouncements apply with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993). Mindful of these standards, we examine each of Hubbard's claims.

## ANALYSIS

### I. Count I—The FMLA Claim

In general terms, the FMLA permits eligible employees to take up to twelve weeks of unpaid leave during any twelve-month period for family or medical reasons, including depression. *See* 29 U.S.C. § 2612. Once the employee returns from leave, the employer must restore the employee "to the position of employment held by the employee when the leave commenced" or to an equivalent posi-

tion. *Id.* § 2614(a)(1)(A), (B). The employer is not required, however, to provide the employee "any right, benefit, or position of employment other than the right, benefit, or position to which the employee would have been entitled had the employee never taken leave." *Id.* § 2614(a)(3)(B). In other words,

> [a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.

29 C.F.R. § 825.216(a).

The FMLA also contains an "antidiscrimination component." *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997). Section 2615(a)(1) prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of, or the attempt to exercise, any right provided" under the FMLA. The next subsection proscribes "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). These two provisions, in connection with the section 2614 right to the same or an equivalent position upon return from leave, appear to be driving Hubbard's FMLA claim.[8] Hubbard claims that the FMLA required Blue Cross to restore her to the Billing Manager position when she returned from leave, and that it refused to do so only because she exercised her FMLA rights.

Because the FMLA has been in effect only five years, legal analysis under the statute is not well established. Various district courts, perceiving the FMLA as a tool to prevent discriminatory employment actions based on an employee's leave status, have evaluated FMLA claims under the familiar burden-

shifting approach developed for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., McCown v. UOP, Inc.*, 1995 WL 519818, at *6 (N.D.Ill. Aug.30, 1995). That is, where the plaintiff lacks direct evidence of the employer's discriminatory intent,[9] she must first establish a prima facie case of adverse employment action based on a protected characteristic; then the employer must produce a nondiscriminatory reason for the action, which the plaintiff must attack by demonstrating that it is pretextual. *See McDonnell Douglas Corp.*, 411 U.S. at 802–05. The Seventh Circuit, however, recently clarified the appropriate analysis for FMLA cases—and in doing so rejected the invitation to use the *McDonnell Douglas* approach. *See Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711 (7th Cir.1997).[10]

In *Diaz*, the court held that an employee's failure to appear for a second-opinion medical examination at the employer's behest was grounds for ending the employee's FMLA leave and terminating him when he failed to return to work. 131 F.3d at 713. The FMLA requires employees on leave to provide certification of a medical condition that prevents work. 29 U.S.C. § 2613(a). Section 2613(c) permits an employer who "has reason to doubt the validity of the certification" to require a second opinion at its own expense. Diaz procured divergent medical opinions about his condition while on leave, prompting his employer to schedule a physical examination in hopes of reconciling the conflict. When he skipped the exam and refused to return to work, Diaz was terminated. He then sued, alleging that his employer improperly denied him leave under the FMLA. *See id.* at 711–12.

The court began by pointing out that Diaz's FMLA claim was not based on the Act's antidiscrimination provisions; rather,

---

8. Hubbard's complaint never discloses the statutory section on which her FMLA claim is based, but she does cite 29 U.S.C. § 2614 in her response brief.

9. In this case, the employer's discriminatory intent would be "to interfere with, restrain, or deny the exercise of, or the attempt to exercise"

an employee's rights under the FMLA, in violation of 29 U.S.C. § 2615(a)(1).

10. We note that, in failing to file *Diaz* with this Court as supplemental authority, both Hubbard's and Blue Cross' counsel neglected their duty to inform the court about new developments affecting the analysis of the present case.

he alleged deprivation of his substantive FMLA rights—the right to take leave in the first place, not the ability to take it without repercussion. *See id.* at 713. In general, the court explained, "claims under the FMLA do not depend on discrimination:"

> The question in a discrimination case is whether the employer treated one employee worse than another on account of something (race, religion, sex, age, etc.) that a statute makes irrelevant.... A statute such as the FMLA, however, creates substantive rights.... The question is not how the [employer] treats others, but whether it respected each employee's entitlements.

*Id.* at 712–13. As such, the court rejected the *McDonnell Douglas* burden-shifting approach—specifically, its use of comparative evidence and pretext analysis—for substantive FMLA claims. *Id.* Instead, the court endorsed a direct approach, which questions whether "the plaintiff has established, by a preponderance of the evidence, that he is entitled to the benefit he claims." *Id.* at 713. Because Diaz did not cooperate with the FMLA's second-opinion process, he lost any entitlement to leave. *Id.*

Significantly, the *Diaz* court acknowledged that the FMLA does contain an antidiscrimination/antiretaliation provision in section 2615(a)(2), although Diaz did not invoke it. *Id.* The court "reserved judgment on th[e] possibility" of analyzing claims under this section using a "derivative burden-shifting approach." *Id.* As an example, the court cited the Third Circuit's section 2615(a) analysis in *Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th Cir.1997), which resembles a Title VII retaliation analysis.[11]

■ Given the *Diaz* court's equivocal stance on *Morgan,* however, we first evaluate Hubbard's FMLA claim using a direct approach, asking whether Hubbard's evidence would permit a reasonable jury to find that she is entitled to a benefit under the FMLA. The "benefit" she claims to have been denied is the right to have her Billing Manger position restored upon returning from leave. Viewing the facts in the light most favorable to Hubbard, we conclude that a reasonable jury could not find that Hubbard was entitled to her former position.

In order to survive summary judgment, Hubbard needs to produce evidence from which a reasonable jury could find that she was entitled to her former or an equivalent position upon her return from FMLA leave. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); 29 U.S.C. § 2614. It is well-settled in this Circuit that an employer may fire an employee who fails to meet the employer's legitimate expectations. *Fuka v. Thomson Consumer Electronics,* 82 F.3d 1397, 1404 (7th Cir.1996); *Ragland v. Rock–Tenn Co.,* 955 F.Supp. 1009, 1014 (N.D.Ill.1997). Moreover, the FMLA and its implementing regulations make clear that an employee has no greater right of reinstatement than if she would have been continuously employed during the leave period. *See* 29 U.S.C. § 2614(a)(3)(B); 29 C.F.R. § 825.216(a). Consequently, if Hubbard would have been terminated because of poor performance regardless of whether she took leave, then Blue Cross did not violate the FMLA. The undisputed evidence shows that this was the case.

The parties agree that Hubbard's performance deteriorated after she received the DVW on July 12, 1995. From July through September, Hubbard turned in a number of late and inaccurate time sheets, and was sometimes tardy and absent. In September, Hubbard was placed on the CAP, which provided that failure to meet any one of its performance goals—including arriving at work on time, completing time sheets correctly, and ceasing insubordinate and hostile behavior—would lead to termination. While

---

**11.** Under *Morgan,* the employee must first establish a prima facie case that: (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two actions. 108 F.3d at 1325. Then the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse decision; if the employer meets its burden, it becomes the employee's responsibility to demonstrate that the reason is pretextual. *Id; see also Dodgens v. Kent Manufacturing Co.,* 955 F.Supp. 560, 566 (D.S.C.1997). This framework has been applied, albeit pre-*Diaz,* by at least one court in this district. *See Clay v. City of Chicago,* 1997 WL 182278, at *2 (N.D.Ill. Apr.9, 1997).

on the CAP, it is uncontested that Hubbard continued to have problems with late and inaccurate time sheets, and that she was not at her desk when scheduled to start work on at least one occasion. Hubbard's October 3 and 20, 1995 CAP reviews announced that she had not met these CAP performance goals.[12] She refused to sign the reviews, not because she denied the time sheet errors or claimed she was at her desk at the appointed time every day, but because she had excuses for this behavior and felt that being penalized for it was unfair. Pl.'s Resp. ¶¶ 32, 34.

Once Blue Cross presented evidence that Hubbard would have been fired for failure to meet the CAP goals even if she had not taken leave, it was incumbent upon Hubbard to produce specific facts from which a jury might reasonably infer otherwise. See Jenkins v. Heintz, 124 F.3d 824, 831 (7th Cir. 1997), cert. denied, —— U.S. ——, 118 S.Ct. 1304, 140 L.Ed.2d 469 (1998); see also Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[The] nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ") (citing Fed.R.Civ.P. 56(e)). In an attempt to do so, Hubbard first attacks Blue Cross' judgment that her performance was poor enough to warrant termination. She offers some self-serving testimony that she was not performing poorly, claiming that she continued to handle accounts well and deal with customers effectively after receiving the DVW. But self-interested assertions concerning one's own abilities are not in themselves sufficient to raise a genuine issue of material fact as to the legitimacy of the employer's reasons for an adverse action. Williams v. Williams Electronics, 856 F.2d 920, 924 (7th Cir.1988); see Schultz v. General Elec. Capital Corp., 37 F.3d 329, 334 (7th Cir.1994) ("[A]n employee's 'own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination.' ") (citations omitted). Moreover, Hubbard fails to offer evidence that she was performing well in the specific areas—time sheet completion and punctuali-

ty—that prompted her termination. See Anderson v. Stauffer Chem. Co., 965 F.2d 397, 403 n. 2 (7th Cir.1992) (plaintiff must show adequate performance in the specific area that the employer claims is deficient); see also Mills v. First Federal Sav. & Loan Ass'n, 83 F.3d 833, 846 (7th Cir.1996) ("The fact that an employee does some things well does not mean that any reason given for [his] firing is a pretext for discrimination.") (internal quotations and citations omitted).

Second, Hubbard argues that she has direct evidence that her termination was not performance-based, but instead was motivated by the fact that she took medical leave. She points to Fortier's October 23 e-mail requesting her time sheets, three days after Lacivita and Fortier claim they decided to fire her, as well as the unsigned letter from Tenia Glass directing Hubbard to return to work on January 2, 1996. Hubbard also relies on the discussions among Fortier, Lacivita and human resources personnel about when Hubbard would be returning from leave and whether they could take disciplinary action against her in the meantime. From all this evidence, Hubbard deduces that the decision to terminate her was not made until after her leave began, and further, that it was based on her decision to take leave.

This is flawed logic. While the e-mail, letter, and discussions cast doubt on the finality of Blue Cross' October 20 "decision" to terminate Hubbard, this evidence does not demonstrate that poor work performance was a facade, that poor performance was not the actual reason for her termination, or that Hubbard's decision to take leave motivated Blue Cross. At most, this evidence demonstrates Blue Cross' concern for work Hubbard left undone, its desire to tie up administrative loose ends, and its legitimate concern for ensuring the legality of disciplining Hubbard while on leave. See McCown, 1995 WL 519818, at *6 (discussion about whether employee's termination was permissible under the FMLA is not direct evidence that FMLA leave motivated termination decision).

12. These reviews also criticized Hubbard for insubordinate and hostile behavior—behavior that Hubbard flatly denies. We express no opinion on the legal effect of this criticism and denial because Hubbard admits to other conduct that failed the CAP goals.

Finally, Hubbard argues that Blue Cross was not entitled to terminate her for failing the CAP goals because the CAP requires 30–days' notice before termination. According to Hubbard, Blue Cross' failure to notify Hubbard about her termination in advance shows that poor performance did not motivate her discharge. But the CAP guidelines submitted by both parties reveal no prior notice requirement. Nor does any other evidence in the record specify how long Blue Cross must wait to fire an employee who fails to meet CAP goals. Consequently, this evidence does not call into question the fact that Hubbard would have been fired even if she had not taken leave.

A direct *Diaz* analysis of Hubbard's claim unearths no genuine issue of material fact enabling a jury to find that Blue Cross violated Hubbard's FMLA rights. Nor does Hubbard fare any better under the "derivative" burden-shifting approach mentioned, but not explicitly endorsed, in *Diaz.* That approach still requires Hubbard to attack the legitimacy of Blue Cross' reasons for discharge—by demonstrating that they are a pretext for discrimination based on leave status. *See Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1325 (10th Cir.1997); *Clay v. City of Chicago,* 1997 WL 182278, at *2 (N.D.Ill. Apr.9, 1997).

■ Pretext can be established by showing (1) that discriminatory intent more likely than not motivated the employer; or (2) that "the employer's proffered explanation is unworthy of credence" because the defendant's explanation had no basis in fact, was not the real reason for the adverse action, or was insufficient justify any adverse action. *See Collier v. Budd Co.,* 66 F.3d 886, 892 (7th Cir.1995). Practically, this means that the plaintiff must raise a genuine question about the credibility of the employer's explanation for the adverse action, or "specifically refute the facts which allegedly support the employer's claim of deficient performance." *Sirvidas v. Commonwealth Edison Co.,* 60 F.3d 375, 378 (7th Cir.1995).

■ We have already found that Hubbard did not specifically refute the facts supporting Blue Cross' claim of deficient performance. Hubbard admits to having failed in the very areas that the CAP clearly explained would be grounds for termination. Nor has she presented evidence that would call the veracity of Blue Cross' reasons into question or demonstrate that they were insufficient to warrant termination. As we explained above, the events after Hubbard took leave do not call the justifications for her termination into doubt. Furthermore, the CAP made it sufficiently clear that failure to meet any one of its objectives would lead to termination, and Hubbard knew, based on her October 1995 reviews, that Fortier did not consider her to be in compliance with the CAP. While Hubbard certainly disagreed with his perceptions, she has not shown that Fortier did not believe them. It is the employer's perception that is determinative of pretext. *See Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 337 (7th Cir.1991) ("The employee's perception of himself ... is not relevant. It is the perception of the decision maker which is relevant.") (internal quotations and citations omitted); *see also Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 891 (7th Cir.1997) (as long as the defendant honestly believes that the employee is not meeting legitimate expectations, termination is justified); *Anderson,* 965 F.2d at 402 (same).

In sum, Hubbard has not produced evidence from which a reasonable jury could find either (1) that she was entitled to her former or a similar position upon return from leave, or (2) that Blue Cross discharged her because she exercised her FMLA rights. Because the evidence does not permit a finding that Blue Cross violated the FMLA, we grant Blue Cross summary judgment on Count I.

## II. Count III—The Sex Discrimination Claim

Aside from her termination, Hubbard takes issue with the legality of Lacivita's reorganization decisions in June 1995—specifically, his de facto promoting two male Billing Managers (Fortier and Thompson) to Billing Manager II, while denying Hubbard and another female Billing Manger the same opportunity. She claims that these actions were motivated by sex discrimination in vio-

878

lation of Title VII of the Civil Rights Act of 1964.

Title VII prohibits employers from discriminating against their employees on the basis of, *inter alia*, sex. 42 U.S.C. § 2000e *et seq.* As in any discrimination case, Hubbard bears the ultimate burden of proving by a preponderance of the evidence that her employment was adversely affected by her gender. She can meet this burden by presenting either direct evidence (e.g., sexist remarks) or circumstantial evidence of discriminatory intent. *See Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). When, as in Hubbard's case, there is no direct evidence of discrimination, the most common way to prove employment discrimination circumstantially is "by way of the burden-shifting approach first articulated in *McDonnell Douglas Corp.*" *O'Connor v. DePaul Univ.*, 123 F.3d 665, 669 (7th Cir.1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). To establish a prima face case of sex discrimination using the *McDonnell Douglas* method, Hubbard must establish that (1) she is female, (2) she was meeting the legitimate expectations of her employer, (3) she suffered some adverse employment action, and (4) she has evidence from which it can be inferred that the adverse action sprang from a "legally forbidden ground," for example, more favorable treatment of similarly situated male employees. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158–59 (7th Cir.1996).

If Hubbard succeeds in making a prima facie showing of discrimination, a rebuttable presumption of discrimination arises and the burden of production shifts to Blue Cross to articulate a legitimate, non-discriminatory reason for Lacivita's decisions. *See Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To meet this burden, Blue Cross must produce admissible evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If Blue Cross meets this burden, the presumption of

discrimination dissolves and the burden of production shifts back to Hubbard to show that the proffered reason is a pretext for discrimination. *See Burdine*, 450 U.S. at 256. Pretext may be established by showing either that discriminatory intent more likely than not motivated the employer or that the employer's proffered explanation is unworthy of credence. *Id.*

■ Hubbard meets the prima facie case elements under *McDonnell Douglas*. First, she is female. Second, all indications in the record are that Hubbard was meeting Blue Cross' legitimate expectations at the time Lacivita reorganized the OSC and promoted her male peers. The performance review Lacivita gave Hubbard just after the reorganization states that she consistently meets and at times exceeds expectations. It is peppered with positive comments about Hubbard's initiative in resolving billing issues, her success at handling accounts, her "top-notch" customer service skills, professionalism, and ability to interact well with peers, subordinates, and other employees. Lacivita's mild comments about Hubbard's need to close out accounts faster were tempered by his observations that any delay was the result of Hubbard's adeptness at spotting billing issues and that she closed out most accounts promptly.

Third, Hubbard suffered adverse action— she was not permitted to upgrade her position by rewriting it, while her male peers were. "Depriving someone of the building blocks for such a promotion ... is just as serious as depriving her of the job itself." *Bryson v. Chicago State Univ.*, 96 F.3d 912, 917 (7th Cir.1996) (denying summary judgment on sexual harassment claim because issue of fact existed regarding loss of tangible job benefit). In addition, Hubbard suffered an adverse impact in the form of losing her office. *Cf. Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir.1987) ("We believe adverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well. For example, other courts have found adverse job impact ... in an employer's moving an employee's office to an undesirable

location, [or] transferring an employee to an isolated corner of the workplace.").

Fourth, Hubbard has presented evidence from which it can be inferred that the adverse actions sprang from a "legally forbidden ground"—in the form of the more favorable treatment afforded her similarly situated male employees. Fortier, Thompson, Hubbard, and Ju–Ton Loving (the other female) all occupied the same Billing Manager position before the OSC reorganization, but only the two males' positions were upgraded to Billing Manager II, and only the females subsequently lost their offices. Blue Cross does not contest the fact that the males were similarly situated to Hubbard. Instead, it responds to Hubbard's evidence by pointing out that another female in the OSC, Cheryl Prater, was promoted at the same time as Fortier and Thompson. But Prater does not provide an appropriate comparison because she was promoted neither from the same position as Hubbard, nor to the same position as Hubbard's male counterparts. *See* Def.'s Facts ¶ 11; Pl.'s Add'l Facts ¶ 8. Moreover, the Seventh Circuit has made clear that an employee's discrimination claim does not fail simply because the employer treats another employee with the plaintiff's protected characteristic favorably. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir.1996). Because Hubbard has set forth a prima facie case, the burden now shifts to Blue Cross to produce admissible evidence of a nondiscriminatory justification for its actions.

■ The Supreme Court explained the defendant's burden of production in detail in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981):

The burden that shifts to the defendant ... is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons.... [But] the defendant must clearly set forth, through the introduction of admissi-

ble evidence, the reasons for the plaintiff's rejection. The explanation must be legally sufficient to justify a judgment for the defendant.

Blue Cross offers one justification in support of Lacivita's decision to permit Fortier and Thompson, but not Hubbard, to upgrade their positions: paragraph four of Lacivita's affidavit, which asserts, "I selected Anthony Fortier and Ken Thompson for the two supervisory positions because they met the criteria I was looking for." We have serious questions whether this constitutes evidence that would justify a judgment in Blue Cross' favor. Blue Cross offers no explanation, anywhere in the record, as to what these criteria are. By failing even to identify the relevant standards that Fortier and Thompson supposedly met, Blue Cross leaves the fact finder with nothing but indeterminate "criteria" to explain the difference in treatment between the male and female Billing Managers. A jury may well wonder if Lacivita's private "criteria" were not overtly based on gender.

But even assuming that Lacivita's statement satisfies Blue Cross' burden of producing a legitimate, nondiscriminatory explanation to rebut the inference of discrimination raised by Hubbard's prima facie case, Blue Cross is still is not entitled to summary judgment because Hubbard has raised a fact issue as to whether this explanation is pretextual. Hubbard may demonstrate that Blue Cross' proffered explanation is a pretext for sex discrimination by showing that it had no basis in fact, that the reason did not motivate the decision, or was insufficient to motivate the action. *See Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir.1995). Under the evidence presented to this Court, Hubbard has succeeded in demonstrating that Lacivita's assertion that Fortier and Thompson met his "criteria" for a supervisory position is without a factual basis.

As explained above, the record contains no evidence of what these criteria are or how Fortier and Thompson met them. Indeed, the record is silent on Fortier and Thompson's job performance and qualifications at the time they were promoted. There is no evidence that Fortier and Thompson were

more senior than Hubbard. We do know, however, that Fortier had absolutely no supervisory experience, at Blue Cross or anywhere else. Pl.'s Add'l Facts ¶ 24. Fortier also admitted to having problems with five to ten of his seventeen accounts during his tenure at Blue Cross, and with getting premiums out in a timely fashion—both of which prompted complaints. Pl.'s Add'l Facts ¶¶ 41–42. In contrast, Hubbard offers her positive performance review dated shortly after her non-promotion, which praises numerous aspects of Hubbard's job performance. Instead of explaining how Fortier and Thompson met Lacivita's criteria for a supervisory position, or how Hubbard did not, Blue Cross stands on the mere conclusory assertions in Lacivita's affidavit, which are generally insufficient to create—much less avoid—a genuine issue of material fact, *cf. Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir.1994) (summary judgment cannot be defeated by "self-serving assertions without factual support in the record"). Viewing this evidence in the light most favorable to Hubbard, there remains an issue of fact as to the credibility of Lacivita's reasons for treating the male employees different from Hubbard.

Although Hubbard has sufficiently called into question the genuineness of Blue Cross' reason for promoting only the male Billing Managers, she still carries the ultimate burden of persuading the fact-finder that Blue Cross intentionally discriminated against her on the basis of sex. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). This can be determined only by a trial on the merits. As such, we leave this issue for the jury, and deny Blue Cross' motion for summary judgment on Count III.

### III. Count IV—The Retaliation Claim

Hubbard's Title VII retaliation claim likewise merits a trial. She claims that the DVW, the CAP and her termination were all retaliation for complaining that sex played a role in Lacivita's failure to upgrade her position. We find that the evidence before us raises a fact issue as to whether the DVW (but not the CAP or Hubbard's discharge) constitutes illegal retaliation.

The retaliation provision in Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [she] has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). As with other Title VII claims, a retaliation claim may be proved circumstantially under the familiar *McDonnell Douglas* burden-shifting analysis.[13] *Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1114 (7th Cir.1992). Initially, Hubbard must make a prima facie showing that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action. *Rennie v. Dalton*, 3 F.3d 1100, 1108 (7th Cir.1993); *Samuelson*, 976 F.2d at 1114. If Hubbard establishes a prima facie case of retaliation, the burden of production shifts to Blue Cross to come forward with a legitimate, non-retaliatory reason for its actions. If Blue Cross rebuts Hubbard's prima facie case in this manner, the burden shifts back to Hubbard to demonstrate that Blue Cross' proffered reasons for disciplining and, ultimately, terminating her were pretextual. *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1146 (7th Cir.1997).

Blue Cross claims that Hubbard cannot establish a prima facie case of retaliation because (1) her complaints to Lacivita and Williams were not statutorily protected expression, and (2) even if her complaints were protected expression, there is no causal connection between the complaints and any adverse employment action. Blue Cross does not contest, however, that the DVW, the CAP, or Hubbard's termination constitute adverse employment actions.

We begin with the first disputed element, protected expression. Hubbard points to two complaints she made about her non-promotion as instances of protected expression. First, she complained to human re-

---

**13.** Hubbard presents no direct evidence of retaliation.

sources employee Beth Williams about the fact that two males were promoted to Billing Manager II positions. Her second complaint was to Lacivita. According to Hubbard, she indicated that she believed "sex played a role" in the promotions of the two males by questioning Lacivita "why the women los[t] their office[s] and the men didn't." The complaints were made in the first week of July 1995, approximately one week before Hubbard received the DVW on July 12. Blue Cross argues that neither complaint is statutorily protected because Hubbard did not specifically state that she did not get the promotion because she is female. We disagree with Blue Cross' overly technical interpretation.

 Statutorily protected expression includes not only formal charges of discrimination, such as formal complaints filed with the EEOC, but also informal grievances to supervisors. *Laird v. Cragin Federal Bank,* 1994 WL 13662, at *6 (N.D.Ill. Jan.18, 1994), *aff'd,* 41 F.3d 1510 (7th Cir.1994); *Maldonado v. Metra,* 743 F.Supp. 563, 568 (N.D.Ill. 1990). The employee need only have had a reasonable belief at the time she complained that she was challenging conduct in violation of Title VII—the challenged conduct need not actually violate Title VII. *Holland v. Jefferson National Life Ins. Co.,* 883 F.2d 1307, 1314 (7th Cir.1989); *Laird,* 1994 WL 13662, at *6. The court will not assume the employee harbored such a belief when she does not specify that she felt sex played a role in the adverse employment decision, absent some objective indications of her mind set. *Id.*

 Viewing the facts in the light most favorable to Hubbard, we find Hubbard's complaints to Lacivita and Williams showed that Hubbard reasonably believed she was challenging conduct that violates Title VII. Complaining to Williams that two *males* received promotions is a sufficiently objective sign that Hubbard was protesting unequal treatment based on gender. In addition, asking Lacivita "why the women los[t] their office[s] and the men didn't" clearly indicates that Hubbard believed she was complaining about unfair treatment because of her sex. We reject Blue Cross' rigid requirement that

employees use specific language for protected expression—an overly cumbersome burden that has no basis in law. Consequently, Hubbard satisfies the first element of a retaliation claim.

 The other element the parties contest is the third, which requires Hubbard to show a causal connection between this protected activity and an adverse action—either the DVW, the CAP, or her discharge. To establish this causal link, an employee must demonstrate that the employer would not have taken the adverse action "but for" the protected expression. *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 479 (7th Cir.1995). Evidence that the adverse action was temporally close to the protected expression may forge the requisite connection. *Pierce v. Martin,* 1997 WL 802104, at *7 (N.D.Ill.Dec.30, 1997); *see McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789 (7th Cir. 1997) (two-to-three-day period between filing EEOC complaint and termination established causation); *Holland,* 883 F.2d at 1315 (one week gap between the protected activity and the adverse action satisfied causation element). But as the temporal distance between protected expression and the adverse action increases, courts are less willing to find a causal link absent additional evidence connecting the expression to adverse action. *McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473, 485 (7th Cir.1996); *see Samuelson,* 976 F.2d at 1115 (three-year separation between expression and action belied any causal connection); *Johnson,* 70 F.3d at 479 (20 months did not establish causal link). In short, the adverse action must occur "on the heels of" the protected expression. *McClendon,* 108 F.3d at 797.

Hubbard made her initial complaint to Lacivita on July 4, 1995, and received the DVW on July 12, 1995. She also complained to Williams the week before receiving the DVW. In short, the DVW was issued on the heels of Hubbard's protected expression. We find that a period of approximately one week between the complaints and the DVW is certainly a "telling temporal sequence," *see Holland,* 883 F.2d at 1314, particularly considering the absence of any similar disciplinary action against Hubbard during the

882

course of her employment with Blue Cross. Viewing the evidence in a light most favorable to Hubbard, we find that she has established the requisite causal connection between her complaints to Lacivita and Williams and the DVW.

Hubbard has also forged a causal link between at least one person to whom she complained and who was responsible for the DVW. Lacivita, the first recipient of Hubbard's protected expression, admits that he directed Fortier to issue the DVW; indeed, he testified that he wanted Hubbard fired at the time. It is not clear from the record whether Fortier knew when he issued the DVW that Hubbard's two complaints were about unequal gender treatment, although it is undisputed that he knew she had complained about her non-promotion. Nevertheless, whether Fortier had actual knowledge of the substance of Hubbard's complaints is inconsequential given Lacivita's admission that he instructed Fortier to issue the DVW.

 In contrast, Hubbard fails to demonstrate a causal link between her informal complaints and the CAP or her discharge. The complaints preceded the CAP's institution by almost three months, and Hubbard's termination by nearly six. These adverse actions did not, therefore, occur on the heels of Hubbard's protected expression. More important, the intervening circumstance of Hubbard's deteriorating performance broke the chain of causation between these actions and her protected expression. The uncontested evidence of Hubbard's time sheet errors, tardiness, and absences leading up to the CAP and discharge belies any finding of "but-for" causation.

 Having found that Hubbard has established a prima facie case of retaliation, we must determine whether Blue Cross can proffer a legitimate reason for the DVW and, if so, whether Hubbard can show that the reason is a pretext for retaliatory action. Fortier claims that the DVW was prompted by (1) Hubbard's insubordinate refusal to give him information on her accounts; (2) her inattention to detail; and (3) her tendency to trim work hours. Lacivita sets forth a slightly different reason for the DVW—a single incident of insubordination. He testified

that Hubbard once "created a scene at her cubical when given an assignment" and "refused to accept the assignment and she spoke in tones that were clearly disrespectful to her supervisor." To meet its burden of production, Blue Cross need only offer reasons that are supported by admissible evidence and are sufficient to warrant a judgment in its favor. *See Burdine*, 450 U.S. at 256. Blue Cross' justifications meet these standards.

Hubbard argues that insubordination, inattention to detail, and work hours are not what motivated the DVW; instead, she claims that Lacivita directed Fortier to issue the DVW because Hubbard complained that sex played a role in her non-promotion. In order to rebut these articulated reasons, Hubbard must show that they have no basis in fact, did not motivate the DVW, or were insufficient to warrant the DVW. *See Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir.1995). It is important to note that it is not relevant whether Hubbard actually had these problems; all that is relevant is whether her employer was sincere in coming to these conclusions. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 69 (7th Cir.1995) (stating that, when employer offers reasons for the challenged actions, the issue is not whether the employee's performance was actually inadequate, but rather whether the employer honestly believed her performance was inadequate); *Dey v. Colt Construction & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir.1994) (noting that the focus of the inquiry is "whether the employer honestly based its employment decision on performance related considerations"). "Although general averments of adequate performance are insufficient to create a factual issue on summary judgment even when corroborated by statements of supervisors or co-workers, a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies." *See Dey*, 28 F.3d at 1460. We view the evidence in its totality to determine whether Hubbard has succeeded in casting doubt on Blue Cross' proffered reasons. *See Washington v. State of Illinois DCFS*, 919 F.Supp. 1182, 1191 (N.D.Ill.1996).

We find Hubbard goes far beyond general assertions of adequate job performance, offering evidence that questions whether Fortier and Lacivita truly believed their stated reasons for issuing the DVW. Just days before Lacivita said he wanted Hubbard fired but decided to issue the DVW instead, he had signed a glowing performance review of Hubbard—a review that specifically praises Hubbard's courteous and professional interaction with peers, subordinates, and other employees, as well as her ability to create a positive corporate image in dealing with co-workers. Lacivita did not witness Hubbard's alleged insubordination, admitted that she had never been insubordinate toward him, and acknowledged that this incident was inconsistent with Hubbard's entire employment history. Despite this glaring inconsistency with Hubbard's past conduct and having no personal knowledge of her insubordination, Lacivita did not see fit to investigate the incident, which surely would have been witnessed by others if Hubbard had "created a scene." It is very telling that Lacivita's sudden change in attitude toward Hubbard came right after she complained to him about the female Billing Managers losing their offices.

Moreover, Lacivita's account differs from Fortier's, which also suffers from credibility problems. Fortier claims that Hubbard was insubordinate because she refused to give him information about her accounts. Again, this is inconsistent with Hubbard's contemporaneous performance review, Lacivita's observations, and Hubbard's employment record—and is uncorroborated as well. The fact that Hubbard arrived at work late and left early on occasion also lacks credence as a reason for the DVW because Lacivita had previously granted her permission to alter her work hours to attend classes. Finally, Fortier's assertion that Hubbard lacked attention to detail directly contradicts Hubbard's performance review, which praises her adeptness at ferreting out billing issues. All this evidence casts doubt on whether Fortier and Lacivita truly believed that Hubbard's performance suffered from these alleged deficiencies. Significantly, these reasons are inconsistent with documented evidence of what Lacivita thought of Hubbard's job per-

formance just prior to the DVW. This, in combination with the suspicious timing of Hubbard's complaint to Lacivita and his direction to issue the DVW, would permit a reasonable jury to find that the DVW was retaliation for Hubbard's protected expression.

Therefore, Hubbard's retaliation claim is appropriate for jury resolution. Summary judgment is denied on Count IV.

## CONCLUSION

In sum, Hubbard has failed to set forth facts from which a reasonable jury could find that Blue Cross violated the FMLA. She has, however, raised a genuine issue of material fact as to whether Lacivita failed to upgrade Hubbard's position because of her sex, and whether Lacivita retaliated against her for complaining about it.

Therefore, Blue Cross' motion for summary judgment is granted in part and denied in part. It is granted on Count I, but denied on Counts III and IV. The parties are ordered to attend a status hearing at 9:15 a.m. on April 24, 1998 to set a fair and efficient schedule for trial on Hubbard's Title VII claims.